# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 13-0266-WS |
| ) | |
| JAMES MICHAEL BYRD, ) | <u>PUBLISH</u> |
| ) | |
| **Defendant.** ) | |

## ORDER

This criminal matter comes before the Court on non-party Gulf Publishing Company, Inc.'s "Motion to Obtain Citizens' Letters Concerning Sentencing" (doc. 19). The Motion, which is opposed by defendant, has been briefed and is ripe for disposition.

**I. Background.**

The defendant, James Michael Byrd, is the former Sheriff of Jackson County, Mississippi. In an Information (doc. 1) filed in this District Court on November 25, 2013, Byrd was charged with violating 18 U.S.C. § 1512(b)(3) by engaging in misleading conduct towards a Sheriff's Deputy with the intent to hinder, delay, and prevent communication to a federal law enforcement officer of information relating to the possible commission of federal offense in Mobile County, Alabama.[1] An executed Plea Agreement (doc. 2) was filed contemporaneously with the Information, and Byrd entered a guilty plea at his arraignment on December 11, 2013. In the written Plea Agreement, the Government agreed to "recommend to the Court that the defendant be sentenced to six months home confinement and six months probation." (Doc. 2, ¶ 21.)

Byrd's sentencing hearing was set for March 11, 2014. During the interim, the U.S. Probation Office prepared a comprehensive Presentence Investigation Report (the "PSR") in Byrd's case, as it does in all criminal matters following conviction via guilty plea or jury verdict.

---

[1] Specifically, the Information charged that after an incident in which Byrd had kicked a handcuffed arrestee, Byrd falsely stated to the deputy, "Do you remember me saying anything to that guy? Kicking or assaulting him, 'cause I don't." (Doc. 1.)

The PSR was filed under seal with the Clerk of Court. (*See* doc. 13.) As the sentencing date drew near, the Court received numerous letters from members of the community, volunteering insights as to Byrd's history and characteristics, as well as input concerning sentencing (the "Sentencing Letters"). Pursuant to local practice, these unsolicited letters from third parties were not docketed in the court file and were not filed with the Clerk of Court; rather, they were housed with the original PSR in a separate sentencing folder maintained by the U.S. Probation Office. As it does in every case, the Court reviewed and considered the PSR and Sentencing Letters, as well as the defendant's sentencing memorandum and the entire court file, in preparation for Byrd's sentencing hearing.

At the March 11, 2014 sentencing hearing, counsel for both sides and Byrd himself urged the undersigned to accept the Government's sentencing recommendation. The Court indicated that it had considered all information in the PSR, then made the following statement:

> "I've also received a number of letters on your behalf that – I've read each and every one of them. And I say a number; it could be as many as 50 letters in here that people have written on your behalf, friends, family members, members of your community over in Mississippi, people involved in government that you've had contact with over the years. And I consider that information as well as anything that has been presented in court today because that's what I'm required to do."

(Doc. 18, at 5.) Later in the hearing, the Court characterized the Sentencing Letters as setting forth "the understanding of the writers with regard to your personality, most of which has been described in the letters as good." (*Id.* at 6-7.) The Court elaborated as follows:

> "I see things, comments and characteristics explained as you being dedicated, having high integrity, honorable, that you are a good law enforcement officer, that you have been a good public servant over the years, a community worker, [and] a coach for 25 years; quite frankly, the kinds of things that one would expect to see for someone who had served in law enforcement for some 42 years. And the bottom line is that there are a lot of people who think highly of you and have contributed information which is important to the Court in forming some opinion about what should be done in this case."

(*Id.* at 7.) No other discussion of or reference to the Sentencing Letters appears in the sentencing hearing transcript.

Ultimately, and after expressly considering all the information before it, the arguments of counsel, and the U.S. Sentencing Guidelines, the Court adopted Government's sentencing recommendation. (*Id.*) Thus, Byrd was sentenced to a term of six months home confinement

with electronic monitoring, followed by six months probation, as well as a $3,000 fine. (Doc. 16; doc. 18, at 7-8.) Judgment (doc. 16) was entered on March 12, 2014. Byrd did not appeal.

The day after Byrd's sentencing hearing, the undersigned's staff fielded a telephone call from a Mississippi attorney representing the *Sun Herald* newspaper in Harrison County, Mississippi. That attorney requested that this Court release the Sentencing Letters to his client because of the high degree of public interest in this case. Internal inquiries confirmed that this District Court has no established policies or procedures allowing for the routine release of Sentencing Letters to media outlets or other third parties upon such an informal request. Indeed, the *Sun Herald*'s inquiry appeared to be one of first impression for the judges of this District Court. Because this request was new territory and the Court's preliminary research on the subject was inconclusive, the undersigned conveyed through chambers staff that the *Sun Herald* must file a motion and brief if it wished to pursue its request to access the letters.

On March 14, 2014, Gulf Publishing Company, Inc. ("Gulf Publishing"), publisher of the *Sun Herald*, filed in this criminal case a Motion to Obtain Citizens' Letters, with an accompanying memorandum of law. (*See* docs. 19, 19-1.) Byrd filed a response in opposition to the Motion (*see* doc. 21), and Gulf Publishing filed a reply in further support of its request (*see* doc. 22).

II.    **Analysis.**

As an initial matter, there is some question as to the propriety of Gulf Publishing's appearance in this criminal matter. Gulf Publishing did not file its Motion until two days after entry of Judgment (doc. 16), and cited no statute, procedural rule, or other authority that would allow it to do so as a third party in Byrd's criminal case. Review of applicable case law suggests that the typical approach in these sorts of circumstances is that the news outlet, journalist or media company seeking disclosure of sentencing materials files a motion to intervene in the criminal action, prior to or contemporaneously with the motion for disclosure. *See, e.g., United States v. Kravetz*, 948 F. Supp.2d 89 (D. Mass. 2013); *United States v. Kushner*, 349 F. Supp.2d 892 (D.N.J. 2005); *United States v. Lawrence*, 167 F. Supp.2d 504 (N.D.N.Y. 2001). That was

not done here. The Court is left with no showing from Gulf Publishing as to why it contends its Motion is procedurally proper.[2]

Assuming that this post-judgment Motion by a third party is properly pending in this closed criminal file, the Court will proceed to examine its merits. Again, Gulf Publishing is seeking access to letters mailed to the Court by members of the community offering their input as to Byrd's sentencing proceeding. Those letters were not filed with the Clerk's Office. They were neither attached to nor discussed in any sentencing memoranda; indeed, copies were not furnished to the parties before, during or after the sentencing hearing. The parties presented no arguments at the sentencing hearing – whether for lenience or for harshness – predicated on the contents of those letters. Logistically, those letters were collected in a sentencing file maintained by the U.S. Probation Office. This Court reviewed that file prior to the March 11 sentencing hearing, and made general reference to the Sentencing Letters during the hearing.

Courts have long honored a "common-law right of access to judicial proceedings." *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001); *see also Siedle v. Putnam Investments, Inc.*, 147 F.3d 7, 9 (1st Cir. 1998) ("The common law presumes a right of public access to judicial records.").[3] Indeed, "[t]he common law right of public access to judicial documents is said to predate the Constitution." *United States v. Amodeo*, 44 F.3d 141, 145 (2nd Cir. 1995). Nonetheless, the Supreme Court has cautioned that

---

[2] Before the Motion was filed, court staff received multiple telephone calls from Gulf Publishing regarding technical filing issues. At that time, staff suggested that a motion to intervene might be the proper way to proceed, but also made arrangements for the Clerk of Court to accept whatever documents Gulf Publishing might submit. After its papers were accepted for filing, Gulf Publishing did not follow through on the procedural issue.

[3] The Court's analysis utilizes the common-law framework identified by Gulf Publishing's Motion. Movant does not invoke the First Amendment as a ground for accessing the Sentencing Letters. Even if it had, any such argument would appear legally infirm. *See, e.g., United States v. Kushner*, 349 F. Supp.2d 892, 902 (D.N.J. 2005) ("the First Amendment does not reach sentencing letters"); *United States v. Lawrence*, 167 F. Supp.2d 504, 508 (N.D.N.Y. 2001) ("the Court finds that the First Amendment right of access does not attach to the letters that were sent directly to the Court"); *see generally Press-Enterprise Co. v. Superior Court of California for Riverside County*, 478 U.S. 1, 8, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (First Amendment right of access to criminal proceedings depends on "whether the place and process have historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question").

"the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files …." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). As a result, "the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." 435 U.S. at 599; *see also Siedle*, 147 F.3d at 10 ("The trial court enjoys considerable leeway in making decisions of this sort."); *United States v. Lawrence*, 167 F. Supp.2d 504, 509 (N.D.N.Y. 2001) ("The decision whether to allow such access is within the discretion of the trial court.").

An obvious preliminary question is whether the Sentencing Letters even qualify as judicial documents within the boundaries of the common-law right of access. In this context, "judicial documents" have been defined as "materials on which a court relies in determining the litigants' substantive rights," *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir. 1986), as distinguished from those that implicate "the judge's role in management of the trial" and "play no role in the adjudication process," *United States v. Kravetz*, 706 F.3d 47, 54 (1st Cir. 2013) (citations omitted). *See Amodeo*, 44 F.3d at 145 ("the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document"). The few authorities located by the Court that apply this concept to sentencing letters are not unanimous; however, the prevailing (and better-reasoned) view is that such letters do, in fact, qualify as judicial documents. *See, e.g., Kravetz*, 706 F.3d at 57-58 (admitting that "there is not much case law on this issue," but opining that "letters sent directly to the court by third parties are meant to effect [*sic*] the judge's sentencing determination and thus take on the trappings of a judicial document under the common law") (citations and internal quotation marks omitted); *United States v. Gotti*, 322 F. Supp.2d 230, 249 (E.D.N.Y. 2004) (sentencing letters "sent directly to the Court are designed to have a direct impact on the Court's sentence," and are "directly relevant to the performance of the judicial function," such that they should be considered judicial documents under the common law); *but see Kushner*, 349 F. Supp.2d at 902 ("the common law reaches sentencing letters only to the extent these letters impacted the sentencing"). The Court therefore concludes that the Sentencing Letters are judicial records that are subject to the public right of access set forth in the common law.

To find that the Sentencing Letters generally are within the scope of the common-law right of access is not the end of the judicial inquiry. Rather, pursuant to *Nixon* and its progeny,

the public's right of access must be balanced, in a case-specific manner, against opposing considerations such as privacy and confidentiality interests of both the defendant and third parties. *See, e.g., United States v. Munir*, 953 F. Supp.2d 470, 475 (E.D.N.Y. 2013) ("Availability to the public of judicial documents under the common law must be balanced against countervailing factors such as the danger of impairing law enforcement or judicial efficiency and privacy interests of the defendant and innocent third parties.") (citation and internal quotation marks omitted); *Gotti*, 322 F. Supp.2d at 250 ("Under the ample flexibility afforded under the common law, the court will be able to appropriately accommodate and balance, in any given situation, the privacy interests of the letter writers and the public's entitlement to open sentencing proceedings.").

For purposes of this analysis, "the privacy interests of innocent third parties … should weigh heavily in a court's balancing equation." *United States v. Madoff*, 626 F. Supp.2d 420, 424 (S.D.N.Y. 2009) (citation omitted); *see also Kushner*, 349 F. Supp.2d at 901 (describing "a delicate balancing whereby privacy concerns and the avoidance of even the remotest chilling effect appear to be weighted quite heavily"). Although Gulf Publishing's filings scoff at the notion, there are sound (and even compelling) policy reasons why preserving the confidentiality of sentencing letters promotes the interests of justice. One court articulated a pitch-perfect synopsis of these concerns as follows:

> "If letters such as these were routinely disclosed and made part of the public record, it may have a chilling effect and discourage the valuable input as to the character of the defendant and other relevant sentencing concerns that would be garnered from the community during the sentencing process."

*Lawrence*, 167 F. Supp.2d at 508. Other courts, including authority on which Gulf Publishing relies in its Motion, have made similar observations. *See, e.g., Kravetz*, 706 F.3d at 58 (recognizing "a legitimate concern that the routine disclosure of third-party letters may discourage valuable input from the community during the sentencing process," and suggesting that this concern must be weighed against the "positive gains" resulting from disclosure); *United States v. Langston*, 2008 WL 5156625, *2 (N.D. Miss. Dec. 8, 2008) ("presentence letters written to a court are judicial documents which are unusually sensitive in nature, and the court further agrees that a court should be hesitant to release such letters, in most cases"); *Kushner*, 349 F. Supp.2d at 908 ("If a general policy of disclosure were in place at the time of defendant's

guilty plea, it is quite likely that numerous of the individuals who have written on his behalf would have declined to do so.").

The above-stated considerations loom large in the balancing equation. When imposing sentence in a criminal case, this Court is bound by statute to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Certainly, the U.S. Probation Office does yeoman's work conducting an in-depth investigation of the defendant's background, history and personal characteristics, then summarizing its findings in the PSR. In the undersigned's experience, however, letters submitted by family members, friends, co-workers, neighbors, professional colleagues, church members, and other citizens of the community are often quite helpful in deriving a more complete picture (both good and bad) of the defendant's personal characteristics. While Gulf Publishing is undoubtedly correct that no formal promises of secrecy or confidentiality were made to induce these individuals to come forward, common sense instructs that many of them would be far less likely to submit such letters and volunteer candid, valuable input into the sentencing process if they knew their words were accessible to the media and might be posted in print or online for public consumption and dissection. As such, the Court concludes that the privacy interests of the letter writers and the interests of the judicial system in obtaining honest, uncensored input on sentencing matters from members of the community militate strongly against disclosure of the Sentencing Letters in this case.

Balanced on the other side of the scale is the public's interest in access to these judicial documents, as discussed *supra*. "The weight of the presumption of access attached to a judicial document is determined by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts," such that its weight "will fall somewhere on a continuum." *Madoff*, 626 F. Supp.2d at 424 (citation and internal quotation marks omitted); *see also Gotti*, 322 F. Supp.2d at 250 ("If the court gives little weight to the letters, the privacy rights of the writers should be accommodated; however, if the letters should have a significant impact on the court's sentence, the public is entitled to know this."). Gulf Publishing frames the interests favoring disclosure in the following terms: (i) by withholding these letters, "the public has been denied learning part of the basis for the Court's sentence passed upon the Sheriff" (doc. 19-1, at 1); and (ii) "the judicial system has an interest in upholding the public's confidence in its proceedings" (*id.* at 3). Under the specific

circumstances of this case, neither argument is particularly convincing; thus, the weight of the presumption of access falls on the low end of the continuum here.

In sentencing Byrd, the Court did not rely extensively on the Sentencing Letters, and did not invoke the specifics of any particular letter. In other words, the contents of particular Sentencing Letters neither drove nor significantly impacted the sentencing decision in Byrd's case. Recall that, as part of the Plea Agreement, the Government made a specific sentencing recommendation, in which Byrd and his lawyer concurred, and for which they all advocated at the sentencing hearing. Review of the PSR, the defendant's sentencing memorandum, the Sentencing Letters, and all other facts and circumstances presented to the Court revealed no persuasive reason to deviate from the Government's bargained-for sentencing recommendation. This is simply not a case in which the specific contents of specific Sentencing Letters made a difference; therefore, the value of disseminating the precise contents of those letters to the public is attenuated. *See Lawrence*, 167 F. Supp.2d at 509 ("In the present case, the specific contents of the letters sent directly to the Court did not play a significant role in the exercise of this Court's judicial power. Thus, the contents of those letters are of no value to the media and the public in their monitoring of this Court's functions.").

That's not to say, however, that the Sentencing Letters were irrelevant to the sentencing determination. To be sure, the Court did consider them. But what mattered was not the particular substance of letter X written by citizen Y; rather, the way the Sentencing Letters played into Byrd's sentencing determination was via general impressions about their quantity and tenor, which impressions were articulated on the record during the sentencing hearing. In particular, the Court indicated that "as many as 50 letters" had been received,[4] mostly describing Byrd as "being dedicated, having high integrity, honorable, that [he is] a good law enforcement officer, that [he has] been a good public servant over the years, a community worker, [and] a coach for 25 years; quite frankly, the kinds of things that one would expect to see for someone

---

[4] The Court did not precisely record the number of letters received prior to the sentencing hearing, but instead made an off-the-cuff estimate during the hearing based on the aggregate physical heft of those letters in hand. To ensure clarity of the record as to Gulf Publishing's Motion, the undersigned has now performed an exact count of all Sentencing Letters received in Byrd's case. A total of 25 letters were received, spanning 43 pages.

who had served in law enforcement for some 42 years. And the bottom line is that there are a lot of people who think highly of [Byrd]." (Doc. 18, at 7.)

The value of the Sentencing Letters to this Court in sentencing Byrd was limited to these narrow insights, which have already been communicated to Gulf Publishing and the general public in open court. As such, movant's assertion that the letters should be disclosed because "the public has been denied learning part of the basis for the Court's sentence" is inaccurate. *See, e.g., Kushner*, 349 F. Supp.2d at 908 (describing weak public interest in disclosure of sentencing letters as to which the sentencing court relied only on their general nature and quantity, reasoning that the value of "public disclosure of those letters is minimal, because the press already realizes most, if not all, of the value of the letters to the public interest when the Court describes these during the sentencing proceedings"); *Lawrence*, 167 F. Supp.2d at 508 ("in imposing sentence in this case, the Court did not rely on the specific contents of any particular letter," but stated during the sentencing hearing that it "was impressed by the sheer quantity of letters supporting Defendant," such that letter writers' interest in confidentiality is not overcome "when the media and the public were thoroughly informed at the sentencing hearing of the nature and quantity of the letters").[5] Accordingly, in the circumstances of this case, the public's interest in disclosure of the Sentencing Letters is weak. That interest has been substantially vindicated by the undersigned's commentary during the sentencing hearing about the nature and quantity of those letters, and thus their value to the Court in fashioning an appropriate sentence for Byrd.

---

[5] Furthermore, the Court cannot agree with Gulf Publishing's implicit premise that the public has an unfettered right to know the entire basis for sentences imposed in criminal cases. It does not. Most notably, presentence reports (on which federal courts routinely rely as a basis for sentencing determinations) are typically shielded from public access because of their sensitive contents. *See, e.g., United States v. Williams*, 624 F.3d 889, 894 (8th Cir. 2010) ("There must be 'some showing of special need' before a district court releases a PSR to a third party.") (citations omitted); *United States v. Wayne*, 591 F.3d 1326, 1334 n.7 (10th Cir. 2010) ("In general, PSRs are not public records and may not be released to third parties."); *United States v. Charmer Industries, Inc.*, 711 F.2d 1164, 1175 (2nd Cir. 1983) ("the district court should not authorize disclosure of a presentence report to a third person in the absence of a compelling demonstration that disclosure of the report is required to meet the ends of justice"); *Langston*, 2008 WL 5156625, at *1 ("Presentence reports are intended for the court's private consideration, are not intended to advance the interests of either party, and are thus comparable to a judicial law clerk's memorandum to the court.").

Movant also suggests that the balancing test favors disclosure in order to protect the interest of the judicial system "in upholding the public's confidence in its proceedings." (Doc. 19-1, at 3.) That was a key consideration in *United States v. Langston*, 2008 WL 5156625 (N.D. Miss. Dec. 8, 2008), the centerpiece legal authority cited in Gulf Publishing's filings. Indeed, the *Langston* court found "a compelling reason to disclose the letters" in that case because the defendant had pleaded guilty to an offense that "caused considerable damage to the justice system in this state," such that "it is particularly important that these proceedings be open and transparent." *Id.* at *2.[6] *Langston* is readily distinguishable on this point. Byrd's conduct is not alleged to have caused (and could not reasonably be viewed as having caused) considerable damage to the justice system in Alabama, much less to have compromised or called into question the integrity of these federal criminal proceedings. Unlike in *Langston*, there are no circumstances attendant to Byrd's offense that have (or reasonably could have) shaken the public's confidence in the integrity of the federal or Alabama justice system. Thus, the extraordinary circumstances that convinced the *Langston* court to release sensitive sentencing letters to the media are not present here. Gulf Publishing has presented no factual predicate in Byrd's case that might give rise to a special interest (above and beyond that in any run-of-the-mill case) in upholding the public's confidence in the judicial system.[7] Besides, as already

---

[6] The Court takes judicial notice that the defendant in *Langston* was an attorney charged with conspiring to attempt to influence a Mississippi Circuit Court Judge by offering favorable consideration to him for appointment to the federal bench in exchange for favorable rulings in a case then pending before that judge in which the defendant was counsel of record. Overt acts charged in furtherance of the conspiracy included (i) the defendant delivering $50,000 cash to retain a close personal friend of the judge for the purpose of influencing the judge; and (ii) the defendant splitting $3 million with the close personal friend and others after the judge entered favorable rulings resulting in settlement of the case.

[7] It is far from clear that the presiding judge in *Langston* would have favored release of the Sentencing Letters in these circumstances. After all, that judge recognized that presentence letters "are unusually sensitive in nature," that "a court should be hesitant to release such letters, in most cases," and that "this court can not rule out the possibility that presentence letters may not be released in future cases." *Langston*, 2008 WL 5156625, at *2. He went on to explain, "the court does view this case as being an exceptional one." *Id.* By contrast, nothing about this case is exceptional in a manner that might warrant or compel release of the Sentencing Letters to the public as a means of engendering confidence in the honest, fair functioning of our judicial system.

stated, the Court has already disclosed at length the reasons for the sentence imposed on Byrd. The public has already received the benefit of information explaining how the Sentencing Letters factored into Byrd's sentence for the crime to which he pleaded guilty. Accordingly, Gulf Publishing's reliance on *Langston* and "public confidence" arguments do not weigh heavily in favor of the Sentencing Letters being released in this case.

One clarification bears noting. The case law rightfully places in a different category (for common-law balancing test purposes) any sentencing correspondence by public officials seeking to influence a sentencing decision. *See Gotti*, 322 F. Supp.2d at 251 ("Letters received from public officials seeking to use their offices to impact a sentence will invariably be disclosed."); *see also Kushner*, 349 F. Supp.2d at 906 ("The public has a strong interest in the use officials make of their positions of public trust. … Further, those officials' privacy interests are at best tenuous when they try to bring their public power to bear upon sentencing proceedings.") (citations omitted). Review of all letters in the sentencing file in this case reveals none from public officials, or anyone holding himself or herself out to be a public official. Rather, all of the letters purport to be from Byrd's friends, relatives, co-workers, ministers, church members, and other citizens of the community. There are thus no "public official" authors of the Sentencing Letters that might warrant disclosure of a subset of such letters to media outlets because of overriding public interest in knowing when public officials are attempting to bring their power to bear on sentencing proceedings.

In sum, as required by applicable law, the Court has carefully balanced all relevant interests and considerations in this case, including the common-law interest of the public in accessing the Sentencing Letters, the privacy interests of the letter writers, and the interest of the judicial system in not chilling the citizenry's willingness to submit such letters. Under the particular facts and circumstances presented here, and in light of the particular arguments and authorities presented by Gulf Publishing, the Court finds that the common-law balancing test tilts toward non-disclosure of the particular letters maintained in the sentencing file.

## III. Conclusion.

One might be tempted to characterize this Order as trivializing the common-law right of access to judicial documents. It does no such thing. The Court well understands and appreciates the importance of the public's right of access to judicial proceedings, and has routinely upheld that right (even in the face of strident objections by parties) in other cases. The public

unquestionably has an important interest in accessing court filings.  Generally speaking, people should know what is happening and why it is happening in our nation's courthouses.  But that interest is neither absolute nor sacrosanct.  There are competing considerations.  Public broadcast of candid sentencing letters sent to a judge by members of the community and intended to be private can have unanticipated, harmful impacts on well-intentioned writers.  It can also discourage letter writers from coming forward, thereby chilling the submission of presentence letters that courts routinely consider (along with all other information) in fashioning appropriate sentences in criminal cases.

The Court has balanced all of these competing circumstances based on the particular facts and circumstances presented here, as filtered through the lens of the relatively sparse authorities cited by the parties and identified in the Court's own research.  In this case, the balance tips in favor of non-disclosure.  No letters were submitted by persons holding themselves out as public officials seeking to use their public office to affect Byrd's sentence.  No particular content in any particular letter influenced the undersigned's sentencing decision.  What the Court did consider at sentencing was the overall number and nature of the letters, which it fairly summarized on the record during the sentencing hearing.  Under these circumstances, the legitimate value to the public of further disclosure would be low,[8] while the potential harm to the letter writers and the judicial process would be high.  For that reason, in the Court's discretion, the Motion of Gulf Publishing Company, Inc. to Obtain Citizens' Letters Concerning Sentencing (doc. 19) is **denied**.

DONE and ORDERED this 7th day of April, 2014.

s/ WILLIAM H. STEELE  
CHIEF UNITED STATES DISTRICT JUDGE

---

[8] The "legitimate value to the public" is a meaningful consideration in the balancing test.  As courts have recognized for more than a century, "[N]o one has a right to examine or obtain copies of public records from mere curiosity, or for the purpose of public scandal, … [or] catering to a morbid craving for that which is sensational or impure. … The judicial records … should not be used to gratify private spite or promote public scandal. … [T]here can be no doubt as to the power of the court to prevent such improper use of its records." *In re Caswell's Request,* 29 A. 259 (R.I. 1893).